UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DE'VAUGHN DAMIEL MASON,

              Petitioner,

v.                                CASE NO. 2:13-cv-12126
                                HONORABLE ARTHUR J. TARNOW

STEVEN RIVARD,

              Respondent.

_____/

## OPINION AND ORDER DENYING THE AMENDED HABEAS CORPUS PETITION, DENYING A CERTIFICATE OF APPEALABILITY, AND GRANTING LEAVE TO APPEAL *IN FORMA PAUPERIS*

This matter has come before the Court on petitioner De'Vaughn Damiel Mason's *pro se* amended habeas corpus petition, which challenges Petitioner's convictions for assault with intent to commit murder, Mich. Comp. Laws § 750.83, possession of a firearm during the commission of a felony, second offense ("felony firearm"), Mich. Comp. Laws § 750.227b, and felon in possession of a firearm ("felon in possession"), Mich. Comp. Laws § 750.224f. Petitioner raises six claims regarding his right to present a defense, the oath read to the jury, the state trial judge's conduct, Petitioner's trial and appellate attorneys, and the lack of an evidentiary hearing during post-conviction proceedings in state court. The State urges the Court to deny the amended petition on grounds that Petitioner did not comply with the Court's abeyance order and his claims are not cognizable on habeas

review, are procedurally defaulted, or are meritless.  Having reviewed the state-court

record and the parties' pleadings, the Court concludes that Petitioner is not entitled

to relief.  Accordingly, the Court will deny the amended petition on the merits.

## I. Background

### A.  The Charges, Trial, Sentence, and Direct Appeal

Petitioner was charged with assault with intent to commit murder or assault

with intent to commit great bodily harm less than murder, felony firearm, second

offense, and felon in possession.   The charges against Petitioner arose from a

shooting outside the Suite 100 nightclub in Detroit, Michigan on March 19, 2010.

Petitioner was tried before a jury in Wayne County Circuit Court.  The Michigan

Court of Appeals briefly summarized the evidence trial as follows:

> Several witnesses testified that defendant, who was working as a
> bouncer at the nightclub, shot Albert Sadler in the arm following a
> dispute involving defendant's refusal to admit Sadler's companions
> into the nightclub without proper identification.  Defendant's theory of
> defense at trial was that he was inside the nightclub at the time of the
> shooting and was misidentified as the shooter.

*People v. Mason*, No. 300008, 2011 WL 6186955 at *1 (Mich. Ct. App. Dec. 13,

2011).

On July 16, 2010, the jury found Petitioner guilty of assault with intent to

commit murder, felony firearm, and felon in possession of a firearm.  On August 6,

2010, the trial court sentenced Petitioner to five years in prison for the felony-firearm

conviction, followed by concurrent prison terms of twenty-five to fifty years for the assault conviction, and five to ten years for the felon-in-possession conviction.

In an appeal of right, Petitioner argued through counsel that the trial court deprived him of his right to present a defense by limiting his questioning of witnesses.  The Michigan Court of Appeals found no merit in Petitioner's claim and affirmed his convictions.  *See id*.

Petitioner raised the same issue and an additional claim about appellate counsel in an application for leave to appeal in the Michigan Supreme Court.  On May 21, 2012, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the questions presented to the court.  *See People v. Mason*, 491 Mich. 920; 812 N.W.2d 745 (2012).

**B.  The Initial Petition and Post-Appellate Proceedings in State Court**

In 2013, Petitioner filed his initial habeas corpus petition, which raised the two claims that Petitioner presented to the Michigan Supreme Court on direct appeal: denial of the right to present a defense and ineffective assistance of appellate counsel.  *See* ECF No. 9.  In a motion attached to the petition, *see id*. at PageID.74-91, Petitioner asked the Court to hold his habeas petition in abeyance while he exhausted additional state remedies.

On April 24, 2014, the Court granted Petitioner's motion for a stay.  *See* ECF No. 19.  The order directed Petitioner to file a motion for relief from judgment in the

state trial court within ninety days of the Court's order and to file an amended petition and a motion to re-open this case within ninety days of exhausting state remedies if he were unsuccessful in state court. The order also closed this case for administrative purposes.

On June 30, 2014, Petitioner filed a motion for relief from judgment in which he argued that: (1) the trial court failed to read a proper oath to the jury; in the alternative, defense counsel was ineffective for failing to object; (2) the trial court assumed the prosecutor's role and pierced the veil of impartiality; (3) trial counsel made various mistakes and omissions; and (4) appellate counsel (a) prevented him from raising issues in a *pro se* supplemental brief and (b) failed to raise issues about trial counsel's ineffectiveness and the trial court's abuse of discretion. *See* ECF No. 27-3.

The successor trial court denied Petitioner's motion because Petitioner had not shown "good cause" for failing to raise the first three issues on direct appeal and "actual prejudice" or a significant possibility that he was innocent. The successor court also found no merit in Petitioner's claims, including his claim about appellate counsel. *See People v. Mason*, 10-003885-01-FC (Wayne Cty. Cir. Ct. Sept. 5, 2014); ECF No. 27-4.

Petitioner moved for reconsideration, *see* ECF No. 27-5, but the successor court denied his motion. The court stated that it did not err in denying relief on the

issue about the jury's oath.  The court declined to revisit the issue about the trial judge's questioning of witnesses, and the court stated that Petitioner had not shown how the court erred in denying relief on the issue of trial counsel's failure to move to suppress photos of the crime scene.  The court found the issues to be without merit, and it concluded that Petitioner was not denied effective appellate assistance when the issues were not presented on direct appeal.  *See People v. Mason*, No. 10-003885-01-FC (Wayne Cty. Cir. Ct. Oct. 1, 2014); ECF No. 27-6.

Petitioner appealed the trial court's decision without success.  The Michigan Court of Appeals denied leave to appeal because Petitioner failed to establish entitlement to relief under Michigan Court Rule 6.508(D).  The Court of Appeals stated that Petitioner alleged "grounds for relief that could have been raised previously and he has failed to establish both good cause for failing to previously raise the issues and actual prejudice from the irregularities alleged, and has not established that good cause should be waived."  *See People v. Mason*, No. 326262 (Mich. Ct. App. May 21, 2015) (citing Mich. Ct. Rule 6.508(D)(3)(a) and (b)); ECF No. 27-7, PageID.1172.

Petitioner then applied for leave to appeal in the Michigan Supreme Court. On February 2, 2016, the Michigan Supreme Court denied leave to appeal for failure to establish entitlement to relief under Michigan Court Rule 6.508(D).  *See People v. Mason*, 499 Mich. 856; 873 N.W.2d 315 (2016).

### C.  The Amended Petition and Request to Compel Discovery

On October 20, 2017, Petitioner filed a motion to re-open this case, an amended habeas petition, and a motion for equitable tolling of the statute of limitations.  *See* ECF Nos. 20-22.  He argues in the amended petition that:

1.  the trial court deprived him of due process and his right to present a defense by limiting his questioning of prosecution witnesses;

2.  the trial court violated his right to due process by failing to read the proper oath to the jury; alternatively, defense counsel was ineffective for failing to object;

3.  the trial judge violated his right to a fair trial by assuming the role of a prosecutor, questioning prosecution witnesses, and piercing the veil of impartiality;

4.  he was denied effective assistance of counsel by counsel's failure to (a) advocate for him without being deflected by conflicting considerations, (b) investigate the case (c) file pretrial motions to suppress evidence, (d) present a defense, and (e) object to the trial judge's questioning of witnesses;

5.  he was denied his constitutional right to effective appellate counsel during the appeal of right because counsel (a) prevented him from raising issues in a *pro se* supplemental brief and (b) failed to raise issues about trial counsel's ineffectiveness and the trial judge's abuse of discretion; and

6.  the trial court erred when evaluating Petitioner's claims about counsel and by not recognizing the need for an evidentiary hearing.

*See* ECF No. 22 at PageID.890-910; *see also* ECF No. 24 (Brief in Support of Amended Pet.).  In his motion for equitable tolling, Petitioner asked the Court to treat his amended petition as timely and to allow him to proceed.  ECF No. 21, PageID.936.

On May 21, 2018, the Court granted Petitioner's motion to re-open his case and allowed him to proceed with his case, despite his failure to comply with the Court's previous order to return to federal court within ninety days of exhausting state remedies for new claims.  *See* ECF No. 25.  The Court declined to say whether any of Petitioner's claims were barred by the habeas statute of limitations.  *See id.* at PageID.941-942.  On July 19, 2018, the State filed an answer to the amended petition and supplemental state-court documents.  *See* ECF Nos. 26 and 27.

Petitioner subsequently filed a motion to hold his petition in abeyance while he attempted to obtain documents from the Detroit Police Department and the Michigan Department of Corrections.  *See* ECF No. 30.   On November 14, 2018, the Court granted Petitioner's motion, and gave Petitioner 120 days from the date of the order to obtain the documents and to submit a reply to the State's response to his amended petition.  *See* ECF No. 31.

Petitioner subsequently filed a reply to the State's response and a motion to conduct or compel discovery to prove his claims.  His motion made a broad request for any documents or electronic information in the Detroit Police Department's

custody, and a more specific request for information on any test performed on a shell casing found at the crime scene and the results of any blood tests completed after his trial. *See* ECF No. 32, PageID.1367, 1370.

The Court granted in part and denied in part Petitioner's motion for discovery. *See* ECF No. 34. The Court ordered the State to determine whether any test results or reports existed on the blood and casing found at the crime scene. The Court denied the motion to the extent that Petitioner sought discovery on any gunshot residue tests. *See id*. at PageID.1410.

The State responded to the Court's discovery order by indicating that its inquiry yielded two laboratory reports from the Michigan State Police Forensic Science Division. *See* ECF No. 35. Both reports address the casing in question, and they are attached to the State's response.

The first laboratory report was prepared by the Latent Print Unit of the State Police Forensic Science Division. It states that a test on the casing was completed on July 18, 2010, and that the evidence "was processed with no latent prints being developed." *See* ECF No. 35-1. The report also indicates that the evidence was turned over to the Firearms Unit for further analysis. *Id*.

The second laboratory report was prepared by the Firearms and Toolmarks Unit of the State Police Forensic Science Division on March 18, 2011. It merely

indicates that "[t]he submitting agency will be notified if an association is made with the NIBIN database."  *See* ECF No. 35-2.

### D.  The Statute-of-Limitations and Procedural-Default Defenses

#### 1.  The Statute of Limitations

The State argues that the amended petition is untimely because Petitioner did not comply with the one-year statute-of-limitations found in 28 U.S.C. § 2244(d) and because Petitioner is not entitled to equitable tolling of the limitation period. *See* ECF No. 26, PageID.962-978.   Petitioner objects to the State's statute-of-limitations argument on the basis that (1) he was exhausting state remedies and (2) serious medical issues and transfers from prison to prison caused his unintentional delay in returning to federal court.  *See* ECF No. 33, PageID.1380-1383, 1385.

Although Petitioner has not submitted any documentation to support the allegations about his medical issues and institutional transfers, his trial attorney pointed out at Petitioner's sentencing that Petitioner suffered from several serious health problems, including chronic asthma, diabetes, rheumatoid arthritis, and pancreatic cancer.  *See* 8/6/10 Sentence Tr. at 4, ECF No. 18-6, PageID.779, 790. Defense counsel described Petitioner as "terminally ill with pancreatic cancer," *id*. at PageID.790, and disabled, *id*. at PageID.792, and Petitioner stated that he was "in and out of the hospital" for dialysis.  *Id*. at PageID.793.

The habeas statute of limitations, moreover, is not jurisdictional, *Holland v. Florida*, 560 U.S. 631, 645 (2010) (quoting *Day v. McDonough*, 547 U.S. 198, 205 (2006)), and Petitioner's claims do not warrant habeas relief. The Court, therefore, will excuse the late filing of the amended petition and the alleged failure to comply with the habeas statute of limitations.

### 2. Procedural Default

The State contends that habeas claims two through four regarding the oath to the jury, the trial judge, and trial counsel are procedurally defaulted because the Michigan Court of Appeals was the last state court to address those claims, and it denied relief due to Petitioner's failure to raise the claims on direct appeal. *See* ECF No. 26, PageID.945, 981-985, 991, 997. Petitioner appears to concede that at least one of his claims is procedurally defaulted, but he argues that appellate counsel was "cause" for his failure to raise all his claims on direct appeal. *See* ECF No. 33, PageID.1385-1386, 1390.

A procedural default ordinarily is not a jurisdictional matter, *Johnson v. Lee*, 136 S. Ct. 1802, 1806 (2016) (quoting *Trest v. Cain*, 522 U.S. 87, 89 (1997)), and a court may bypass a procedural-default question in the interest of judicial economy if the claim is easily resolvable against the habeas petitioner. *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997). The Court "cut[s] to the merits" here, as a procedural-

default analysis would only complicate this case.  *See Thomas v. Meko*, 915 F.3d

1071, 1074 (6th Cir.), *cert. denied*, 139 S. Ct. 2726 (2019).

## II.  Standard of Review

28 U.S.C. § 2254(d) imposes the following standard of review for habeas

cases:

> An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be granted
> with respect to any claim that was adjudicated on the merits in State
> court proceedings unless the adjudication of the claim –
>
> (1)  resulted in a decision that was contrary to, or involved an
>      unreasonable application of, clearly established Federal
>      law, as determined by the Supreme Court of the United
>      States; or
>
> (2)  resulted in a decision that was based on an unreasonable
>      determination of the facts in light of the evidence
>      presented in the State court proceedings.

28 U.S.C. § 2254(d).  Additionally, this Court must presume the correctness of a

state court's factual determinations.  28 U.S.C. § 2254(e)(1).

A decision of a state court is "contrary to" clearly established federal law if

the state court arrives at a conclusion opposite to that reached by the Supreme Court

on a question of law or if the state court decides a case differently than the Supreme

Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S.

362, 405-06 (2000).  An "unreasonable application occurs" when "a state-court

decision unreasonably applies the law of [the Supreme Court] to the facts of a

11

prisoner's case." *Id.* at 409.  A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Id.* at 411.

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  Thus, "[o]nly an 'objectively unreasonable' mistake, . . . one 'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement,' slips through the needle's eye of § 2254." *Saulsberry v. Lee*, 937 F.3d 644, 648 (6th Cir.) (quoting *Richter*, 562 U.S. at 103), *cert. denied*, 140 S. Ct. 445 (2019).

## III. Discussion

### A.  The Right to Defend and the Questioning of Witnesses

Petitioner alleges first that the trial court deprived him of his constitutional right to present a complete defense by limiting defense counsel's questioning of Sergeant Michael Jackson and Investigator James Blanks.  Petitioner contends that defense counsel was prevented from asking those witnesses about: (1) an unknown individual who may have been the shooter; (2) the police department's policy on

testing for gunpowder residue; (3) DNA testing of blood swabs, as well as, the position and location of blood drops; and (4) the results of any fingerprints on a casing found at the scene. *See* ECF No. 22, PageID.890-891.

Petitioner contends that each time defense counsel attempted to cross-examine Sergeant Jackson and Investigator Blanks on these issues, the trial court prevented him from doing so. He claims that the limitations which the trial court placed on his cross-examination of Jackson and Blanks invaded the jury's role, denied him the right to present a defense, and undermined the truth-seeking function of the trial process. *See id.* at PageID.891.

The Michigan Court of Appeals adjudicated this issue on direct appeal and concluded that the trial court gave Petitioner an opportunity to present his defense and did not violate his right to due process. In reaching this conclusion, the Court of Appeals noted that:

> [t]he [trial] court allowed defense counsel to cross-examine the police officers regarding the failure to conduct a gunshot residue test and the fact that they did not receive the DNA test results or the fingerprint analysis. Counsel was thus permitted to show the jury that the tests were either not conducted or that the results were never received. The trial court also gave defense counsel an opportunity to cross-examine the prosecution's witnesses regarding their vantage points at the time of the shooting, and defendant called five witnesses, including himself, to testify on his behalf. Moreover, defendant admitted two exhibits— pictures depicting the nightclub's foyer and back door—both supporting the defense witnesses' testimony.

*Mason*, 2011 WL 6186955, at *3.  For reasons given below, the state appellate court's adjudication of Petitioner's claim on the merits was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent on the right to present a defense.

## 1.  Clearly Established Federal Law

The Supreme Court stated in *Crane v. Kentucky*, 476 U.S. 683 (1986), that, "[w]hether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense."  *Id.* at 690 (citations and quotation marks omitted).  Defendants have a right to present to present testimony that is relevant, material, and vital to the defense.  *See Washington v. Texas,* 388 U.S. 14, 16 (1967).

"The right to present a defense, however, is not absolute."  *Ferensic v. Birkett*, 501 F.3d 469, 475 (6th Cir. 2007) (citing *Taylor v. Illinois*, 484 U.S. 400, 409 (1988), and *Michigan v. Lucas*, 500 U.S. 145, 152 (1991)).  The right "is subject to reasonable restrictions," *United States v. Scheffer*, 523 U.S. 303, 308 (1998), and the exclusion of evidence is unconstitutionally arbitrary or disproportionate only if it "infringed upon a weighty interest of the accused," *id.*, or "significantly undermined fundamental elements of the defendant's defense," *id.* at 315.  Trial judges may "exclude evidence if its probative value is outweighed by certain other factors such

as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Holmes v. South Carolina*, 547 U.S. 319, 326 (2006).  The Constitution also permits judges to exclude evidence that is repetitive or only marginally relevant.  *Id.* (quoting *Crane*, 476 U.S. at 689).

Furthermore, "erroneous evidentiary rulings rarely constitute a violation of a defendant's right to present a defense." *United States v. Hardy*, 586 F.3d 1040, 1044 (6th Cir. 2009) (citing *Washington v. Schriver*, 255 F.3d 45, 56 (2d Cir. 2001)).  A reviewing "court's duty 'is not to determine whether the exclusion of the evidence by the trial judge was correct or incorrect under state law, but rather whether such exclusion rendered [the] petitioner's trial so fundamentally unfair as to constitute a denial of federal constitutional rights.' " *Lewis v. Wilkinson*, 307 F.3d 413, 420 (6th Cir. 2002) (quoting *Logan v. Marshall*, 680 F.2d 1121, 1123 (6th Cir. 1982)).  Therefore, "even if exclusion of evidence was erroneous under state law, the constitutional right to present a defense is not abridged unless the evidence was so material that it deprived the defendant of a fair trial." *Allen v. Howes,* 599 F. Supp. 2d 857, 872 (E.D. Mich. 2009).

### 2.  Application

#### a.  Other Possible Suspects

Petitioner first contends that defense counsel was prevented from asking Sergeant Jackson and Investigator Blanks about an unknown individual who may

have been the shooter.  Petitioner has not cited to the transcript on this issue, and the Court has found nothing in the record that suggests defense counsel was prevented from asking the police officers about other suspects.  Therefore, Petitioner's sub-claim on this issue fails.

### b.  Gunpowder Residue Tests

Petitioner alleges next that he was prevented from asking the police officers about the police department's policy on gunshot residue testing.

### i.  Cross-Examination of Sergeant Michael Jackson

Sergeant Jackson testified on direct examination that Petitioner did not ask for a gunpowder residue test, that the Detroit Police Department did perform gunpowder residue tests, and that it would have been customary to conduct such a test if Petitioner had requested one.  *See* 7/15/10 Trial Tr., ECF No. 18-4, PageID.585.

On cross-examination, Sergeant Jackson explained what a gunpowder residue test was and its purpose.  After Jackson repeated that he would have administered the test, if Petitioner had requested it, defense counsel asked Jackson whether it behooved the police department to administer the test even if Petitioner did not ask to be tested.  Jackson answered the question by explaining that the decision to administer the test depends on the investigation, the type of witnesses, and what happened in the case.  Jackson also explained that time can be a factor and that he interviewed Petitioner about twenty-three hours after the crime.  Jackson also stated

that, even though the Detroit Police Department was still administering gunpowder residue tests at the time, the test normally should be done within six hours of firing a gun. *See id.* at PageID.586-589.

Later, on redirect examination, Sergeant Jackson reiterated that he would have administered a gunpowder residue test if Petitioner had requested one. *See id*. at PageID.599. Defense counsel then asked Jackson on re-cross examination whether the officer in charge of a case, and not the defendant, usually makes the request for a gunpowder residue test. *See id*. at PageID.600. When the prosecutor objected to the general question, the trial court said,

> You know, I don't see why we are spending so much time with this. He said that he didn't conduct a test. One was not done. He said that even the time factor was something because it was 23 hours or something afterwards. He didn't do it. Regardless of whether he did or did not ask for it, it was not done. What else do we need to know from this?

*Id.* at PageID.601.

Defense counsel persisted that it was important, because Sergeant Jackson was attempting to tell the jury that defendants usually ask for the test. The trial court then asked the prosecutor to stipulate that a defendant does not have to ask for a gunshot residue test before the police may give test, and the prosecutor conceded that, in some circumstances, the test may be done whether or not the defendant asks for the test. *See id*. at 601-602.

The trial court responded:  "The police can do that.  I think that's what Sergeant Jackson has said.  I don't understand what the point is.  I'll give you one more opportunity to tell me what it is you are concerned about."  *Id*. at PageID.602. Defense counsel replied, "I'm fine, your Honor.  You just straightened it up." *Id*. That concluded Sergeant Jackson's testimony.

### ii.  Cross-Examination of Investigator James Blanks

The issue arose again during Investigator Blanks' testimony.  He testified on direct examination that he saw no need for a gunpowder residue test because at least eight witnesses had identified Petitioner as shooter, and identification was not an issue.  Blanks also stated that, if he had received a request for a gunpowder test, his response would have been that the lab was closed and that evidence technicians no longer prepared the kits needed to do the test, although it might still be done in homicide cases.  *See id*. at PageID.606-607.

On cross-examination, defense counsel asked Blanks whether it was the Detroit Police Department's policy not to do gunpowder residue tests after the Detroit crime lab closed.  Blanks answered, "No," that was not the Department's policy.  *Id*. at PageID.613.  But when defense counsel attempted to ask Blanks whether he could have administered a gunpowder residue test, the trial court said,

> I'm going to cut this off right here.  We have been over this ad infinitum. There was no test done.  Whatever the reason might have been, it was not done.  There is no sense in spending a great deal of

time with explaining the what and why and why it wasn't done.  It wasn't done.  So, that's the end of that.

*Id*. at PageID.613.  Defense counsel persisted, but the trial court said there was no value in the reasons why the test was not done.  *See id*. at PageID.614.

### iii.  The State Appellate Court's Decision

The Michigan Court of Appeals concluded on review of Petitioner's claim that the trial court did not abuse its discretion by restricting cross-examination on the police department's failure to conduct a gunpowder residue test.  This was a reasonable decision, because the record demonstrates that defense counsel had an opportunity to explore the gunpowder issue with Sergeant Jackson and Investigator Blanks, and he established the fact that the test could have been, but was not, administered. The reason why the test was not administered was only marginally relevant.

The Court of Appeals also reasonably concluded that Petitioner's right to present a defense was not violated.  The reason for not administering the gunpowder residue test was not vital to Petitioner's defense that he was not the shooter.  The prosecutor, moreover, stipulated that, in some circumstances, the test may be administered even if the defendant did not ask for it.

Finally, defense counsel was able to use the police department's failure to administer the test as part of the defense.  He stated during closing arguments that the police had conducted a poor investigation, in part, because they did not perform

*Mason v. Rivard*, No. 2:13-cv-12126

a gunpowder residue test.  Defense counsel also said that either Sergeant Jackson or Investigator Blanks was not telling the truth because Jackson testified that the department could have performed the test, and Blanks testified that the department was not doing the test at the time.  *See id.* at PageID.725-727.

Petitioner's right to present a complete defense was not violated by the limitations placed on his cross-examination of the police officers regarding gunpowder residue tests.  Habeas corpus relief, therefore, is not warranted on Petitioner's sub-claim.

### c.  The Location and Testing of Blood

Petitioner alleges that defense counsel was prohibited from questioning a police officer about the location of blood found at the crime scene and DNA tests performed on the blood.  This claim arose when defense counsel asked Investigator Blanks whether he had ordered someone to collect a swab of blood found at the crime scene and whether he had ordered tests on the blood swab.  Blanks answered that he did order someone to collect a swab and that he submitted the blood for DNA testing, but that he had not received the test results.  *See id*. at PageID.620.

When defense counsel asked Blanks whether he had called the lab before trial and requested the test results, the prosecutor objected, and the trial court questioned the relevance of defense counsel's inquiry.  *See id*. at PageID.621-622.  The court also stopped any further questioning on whether Blanks had sent the blood to the

lab, how the blood was sent, and whether Blanks had received the test results.   *See*

*id*. at PageID.622.   The court said:

> There is nothing here in terms of . . . any blood spots or anything being
> attributed to [your client].   If it's supposedly attributed to Mr. Sadler,
> we know he was shot out there, so I'm trying to understand what is the
> significance of whether or not the blood or DNA would show anything,
> no matter who and what.
>
> If you do that, you have to be able to compare that blood to
> somebody to get a DNA test. So, you have to start with person A and
> say this is their blood. Who is it that you are suggesting the blood
> belongs to? Those are the kind of questions that need to be asked
> beforehand, otherwise it's just mass confusion.

*Id*. at PageID.622-623.

The court then asked defense counsel whether he wished to ask Blanks

anything more.   Defense counsel responded to the court's inquiry by stating that he

wanted to ask Blanks where the blood was found.   The court denied counsel

permission to ask that question.   *See id.* at PageID.623.

The Michigan Court of Appeals concluded on review of Petitioner's claim

that the trial court did not abuse its discretion by prohibiting questions on the DNA

testing of the blood swab.   The Court of Appeals correctly pointed out that the

> case presented no issue concerning the victim's identity, and the trial
> court allowed defense counsel to inquire regarding the location of the
> blood in relation to where Sadler was shot. The trial court properly
> determined that the DNA test results were irrelevant given that the
> identity of the victim was undisputed.  Moreover, the exact location of
> the blood drops was irrelevant to the ultimate issue of whether
> defendant committed the shooting.

*Mason*, 2011 WL 6186955, at *2.

For the reasons given by the Court of Appeals, the exclusion of testimony about the location and testing of blood did not undermine a fundamental element of the defense, and, therefore, it did not violate Petitioner's right to present a defense. Evidence about the location and source of the blood was not relevant to the main question of whether Petitioner shot the victim.

Even if evidence about the blood were relevant, the evidence technician had already testified that he observed the blood on the sidewalk across the street from the nightclub. *See* 7/14/10 Trial Tr., ECF No. 18-3, PageID.383. And defense counsel used Investigator Blanks' failure to obtain test results on the blood to support the defense that Blanks' investigation of the crime was inadequate, that the physical evidence did not mesh with the eyewitnesses' testimonies, and that the eyewitnesses were lying about where the victim fell after being shot. *See* 7/15/10 Trial Tr., ECF No. 18-4, PageID.718-719, 722-724. Petitioner was not deprived of his right to present a defense, and he has no right to relief on his sub-claim about the limitations placed on his questions about the location and testing of blood.

### d. Fingerprints

Petitioner's final sub-claim regarding his right to present a defense alleges that defense counsel was prohibited from questioning a police officer about the results of any fingerprint tests performed on a casing found at the crime scene. Defense

counsel, however, was permitted to ask Investigator Blanks whether he ordered someone to collect the casing at the crime scene and whether the casing was preserved for fingerprints.  Blanks answered that he did order someone to collect the casing, that the casing was sent to the lab, but that the lab had not returned a report.  *See* 7/15/10 Trial Tr., ECF No. 18-4, PageID.615-616.   When defense counsel subsequently asked Blank for the date that he sent the casing to the lab, the prosecutor objected, and the trial court said:

> Stop for a minute.  Stop for a minute.  Everybody.  Okay.
>
> Let me try to be as calm as I possibly can here out of my own frustration.
>
> We can get to this very quickly. If he sent it to the lab, did he get a report back saying that the Defendant's fingerprints were on that, if not, he says no, what's left?  It is very simple.  Two questions.  Let's move on, please.

*Id*. at PageID.617.  The court then asked Blanks whether he had received a report indicating that Petitioner's fingerprints were on the casing, and Blanks responded, "No."  *See id*. at PageID.617-618.

Defense counsel subsequently asked Blanks whether he had contacted the lab and asked for the report, knowing that the case was set for trial.   *See id*. at PageID.618.  The trial court determined that counsel's question was argumentative, because there was no evidence that Petitioner's fingerprints were on the casing.  *See id*. at PageID.618-619.

Defense counsel, nevertheless, expressed his concern about the thoroughness of the investigation.  The trial court then said:

> I have ruled that [there is] no more to be said about it.  He didn't get the report back.  There is nothing in evidence to indicate one way or the other about any kind of fingerprints here so there is no evidence here. The jury doesn't have to be caught up if there are fingerprints or not.  It's not an issue.  We're not going to get into whether the police dotted all the I's and crossed all the T's unless it touches on something that they didn't do that is important to the case and to the evidence here. Otherwise, let's move on to something more pertinent.  That's it.  Move on.

*Id*. at PageID.619.  The Michigan Court of Appeals reasonably concluded from the record that the trial court did not abuse its discretion by prohibiting further questions about fingerprint analysis on the casing.

The state appellate court's additional conclusion that Petitioner was not deprived of his right to present a defense was not an unreasonable application of Supreme Court precedent, because the lack of any fingerprint evidence tying Petitioner to the crime benefitted Petitioner.  Additionally, the officer's failure to request the lab report before trial supported Petitioner's defense that the police did not conduct a thorough investigation.  Petitioner is not entitled to relief on his sub-claim about any fingerprints on the casing found at the crime scene.

### 3.  Conclusion

Petitioner had a meaningful opportunity to present a complete defense, and the limitations placed on defense counsel's cross-examination of witnesses did not

render Petitioner's trial fundamentally unfair, because the excluded testimony was not vital to Petitioner's defense. The state appellate court's rejection of Petitioner's right-to-defend claim was objectively reasonable; therefore, Petitioner is not entitled to relief on his claim.

### B. The Oath to the Jurors

Petitioner alleges next that the trial court violated his right to due process by failing to read the proper oath to the jury during the court's preliminary instructions to the jury. Petitioner contends that oaths to the jury are designed to protect the fundamental right to trial by an impartial jury, but the oath in his case did not accord with the law, and his trial attorney was constitutionally ineffective for failing to object to the instruction. *See* ECF No. 22, PageID.892-894.

The disputed oath was administered to the jury following jury selection. It reads:

> Do you solemnly swear or affirm that in this action now before the Court you will justly decide the questions submitted to you, that unless you are discharged by the Court from further deliberations, you will render a true verdict and that you will render your verdict only on the evidence introduced and in accordance with the instructions of the Court.

7/14/10 Trial Tr., ECF No. 18-3, PageID.361.

Although the jurors responded, "Yes," Petitioner contends that the oath did not conform to Michigan law because the phrases "so help you God" and "this you

do under the pains and penalties of perjury" are missing from the oath.[1]   Petitioner

asserts that the missing phrases were mandatory requirements and that their omission

rendered the preliminary instructions constitutionally deficient, because the jury was

not informed of the serious nature of the charges or that their findings would impact

his life.   According to Petitioner, the proper oath was needed to ensure that the jurors

paid attention to the evidence, observed the credibility and demeanor of the

witnesses, and conducted themselves as befits someone holding an important

---

[1]   Petitioner relies on Mich. Comp. Laws § 768.14, which reads:

> The following oath shall be administered to the jurors for the trial of all criminal cases:   "You shall well and truly try, and true deliverance make, between the people of this state and the prisoner at bar, whom you shall have in charge, according to the evidence and the laws of this state; so help you God."

The corresponding court rule states that

> [t]he jury must be sworn by the clerk substantially as follows:

> "Each of you do solemnly swear (or affirm) that, in this action now before the court, you will justly decide the questions submitted to you, that, unless you are discharged by the court from further deliberation, you will render a true verdict, and that you will render your verdict only on the evidence introduced and in accordance with the instructions of the court, so help you God."

Mich. Ct. R. 2.511(H)(1).   Pursuant to Mich. Comp. Laws § 768.15, jurors must "be allowed to make affirmation, substituting the words 'This you do under the pains and penalties of perjury' instead of the words 'so help you God.' "

position.  Petitioner also maintains that, without the oath, the jury had no authority to render a verdict on his guilt or innocence.  *See* ECF No. 22, PageID.893.

The successor trial court, however, stated in its order denying Petitioner's motion for relief from judgment that, "[a]lthough the oath did not specifically include the words 'so help you God' or under the 'pains and penalties of perjury,' it [was] nearly identical to the oath prescribed in MCR 2.511(H)(1) as well as M Crim JI 2.1."  *See* ECF No. 27-4, PageID.1147.  The court also stated that the oath "was satisfactory because it required the jurors to 'solemnly swear or affirm' they would 'justly decide the questions submitted' to them, and 'render a true verdict' based "on the evidence introduced and in accordance with the instruction of the Court."  *Id*. The court concluded that "[t]he oath as given did not affect the defendant's rights." *Id*.

## 1. Legal Framework

Defendants in criminal cases have a constitutional right to an impartial jury and a fundamentally fair trial.  *See Skilling v. United States*, 561 U.S. 358, 438 (2010).   These rights "guarantee to criminal defendants a trial in which jurors set aside preconceptions, disregard extrajudicial influences, and decide guilt or innocence 'based on the evidence presented in court.' "  *Id*. (citing *Irvin v. Dowd,* 366 U.S. 717, 723 (1961)).

Nevertheless, Petitioner has not cited any Supreme Court decision that requires trial courts to administer an oath containing the phrases "so help you God" and "this you do under the pains and penalties of perjury."   As stated in *Baldwin v. State of Kansas*, 129 U.S. 52, 56 (1889), "no federal question is presented in regard to the oath administered to the jurors of which this court can take jurisdiction," *id.* at 56, and "federal habeas applies only to convictions that offend 'the Constitution, laws, or treaties of the United States.' " *Keahey v. Marquis*, __ F.3d __, No. 18-4106, 2020 WL 6145774, at *2 (6th Cir. Oct. 20, 2020) (quoting *Estelle v. McGuire*, 502 U.S. 62, 68, 71–72 (1991)).

Petitioner's assertion that, without the oath, the jury had no authority to render a verdict is not a cognizable claim on federal habeas review.  *See Smith v. Sec'y, Dep't of Corr.*, No. 8:13-CV-2260-T-36AEP, 2020 WL 451680, at *39 (M.D. Fla. Mar. 25, 2020) (unpublished decision stating that the "Petitioner's assertion that the oath was inadequate to confer jurisdiction on the trial court because under Florida law the bailiff was not authorized to administer an oath to a jury panel fails to present a claim cognizable on federal habeas review"), appeal filed, No. 20-11369 (11th Cir. Apr. 10, 2020);  *Dixon v. Giles*, No. 1:11-CV-1112-WHA, 2015 WL 277206, at *1 (M.D. Ala. Jan. 22, 2015) (unpublished decision stating that, "[w]hether the trial court failed to follow state procedure regarding the jury oath is a matter of state law and is not cognizable on federal habeas corpus review").

## 2. The Instructions and Oath in Petitioner's Case

Even if Petitioner's claim were construed as a federal constitutional claim, the oath read to the jurors in his case did not violate Petitioner's constitutional rights to a fair trial and an impartial jury. During the *voir dire* proceedings, the trial court stressed the importance of having jurors who could be open-minded, fair, impartial, and capable of deciding the case on the evidence. *See* 7/14/10 Trial Tr., ECF No. 18-3, PageID.264-265. The court explained that jurors decide the facts, the weight to be assigned to the evidence, and the credibility of witnesses. *See id*. at PageID.288-289, 292-293.

Later, after swearing in the jurors, the trial court emphasized once again that the jurors were the sole judges of the facts and that they alone would determine the weight and value of the evidence and the credibility of witnesses. *See id*. at PageID.363, 367. The court also encouraged the jurors to be alert for anything in a witness's words, demeanor, or behavior that might help them judge the truthfulness, accuracy, and weight to be given the testimony. *See id*. at PageID.367. The court also cautioned the jurors not to decide any issue until the entire case had been submitted to them for deliberation. *See id*. at PageID.368.

Finally, at the close of the case, the trial court informed the jurors that it was their responsibility, and not the court's, to decide the facts, to apply the law to the facts, to decide whether a witness was believable, and to determine whether the

prosecution had proved Petitioner was guilty beyond a reasonable doubt.  The court charged the jurors to perform their duties fairly, and it reminded the jurors that they had "taken an oath to return a true and just verdict based only on the evidence and [the court's] instructions on the law."  *See* 7/16/10 Trial Tr., ECF No. 18-5, PageID.740-741, 744.

The trial court's instructions, taken as a whole, informed the jurors of their duties, stressed the importance of their role in the case, and required them to be fair and impartial.  When combined with the oath that the court read to the jury, there can be no doubt that the jurors were alerted to the seriousness of their responsibility in deciding the case and the need to pay attention to the evidence, to observe the witnesses carefully, and to conduct themselves as befits someone holding an important position.

Therefore, Petitioner's rights to a fair trial and an impartial jury were protected, even though the oath read to the jury did not contain the phrases "so help me God" and "this you do under the pains and penalties of perjury."  For the same reasons, defense counsel's failure to object to the oath did not amount to constitutionally ineffective assistance of counsel.

## C.  The Trial Court's Conduct

Petitioner alleges that the trial judge abused his discretion and violated Petitioner's rights to due process and a fair trial by extensively questioning

30

prosecution witnesses like a prosecutor, rather than a detached and impartial judge. Petitioner claims that the judge's questioning denied him the right of confrontation, his right to present a defense, and his right to have counsel in his defense.  Petitioner also contends that the judge's conduct communicated to the jury that the judge had an affinity for the prosecution and was biased against Petitioner.  *See* ECF No. 22, PageID.895-897.

The successor trial court opined on review of Petitioner's claim that Petitioner had failed to show the trial judge's questions were biased, intimidating, argumentative, prejudicial, unfair, or partial to the prosecutor.  The court stated that the trial judge's questions were designed to clarify the testimony and that the judge's instruction to the jury regarding its questions cured any potential prejudice inferred by the trial court's statements or questions.  *See* ECF No. 27-4, PageID.1147-1148. Petitioner contends that the successor court was wrong, given "the massive number of times the trial judge . . . took over the questioning of witnesses."  *See* ECF No. 22, PageID.897.

### 1.  Clearly Established Federal Law

The Due Process Clause of the Fourteenth Amendment to the United States Constitution "requires a 'fair trial in a fair tribunal,' before a judge with no actual bias against the defendant or interest in the outcome of his particular case."  *Bracy v. Gramley*, 520 U.S. 899, 904–05 (1997) (quoting *Withrow v. Larkin*, 421 U.S. 35,

46 (1975)).  "Although the trial judge does not have to be a passive bystander, the court should avoid interjecting itself unnecessarily into the questioning of an important witness, particularly in a criminal case.  It is not the job of the trial judge to try the case for the government."  *United States v. Stavroff*, 149 F.3d 478, 482 (6th Cir. 1998).

But trial judges are not mere moderators of court proceedings.  They must govern "the trial for the purpose of assuring its proper conduct and of determining questions of law," *Quercia v. United States*, 289 U.S. 466, 469 (1933), and "exert substantial control over the proceedings," if necessary, to avoid sacrificing truth and fairness.  *Geders v. United States*, 425 U.S. 80, 87 (1976).  Within limits, the judge may . . . refuse to allow cumulative, repetitive, or irrelevant testimony, and may control the scope of examination of witnesses."  *Id.* at 86-87 (internal and end citations omitted).  The judge may also "interject himself [or herself] into the trial, speak to counsel, and question witnesses in order to clear up confusion regarding the evidence or aid in its orderly presentation."  *United States v. Powers*, 500 F.3d 500, 511 (6th Cir. 2007) (citing *McMillan v. Castro,* 405 F.3d 405, 410 (6th Cir. 2005)).  One of the most crucial parts of the inquiry is the manner in which the trial "court chose to interject itself; it is important that the [trial] court act with a neutral, unbiased demeanor when addressing counsel and witnesses.  The trial court should

not continuously intervene on the side of only one of the parties." *Id.* at 512 (citations omitted).

To prevail on a claim of judicial bias, the petitioner must show "there was bias, or such a likelihood of bias or an appearance of bias that the judge was unable to hold the balance between vindicating the interests of the court and the interests of the accused." *Ungar v. Sarafite*, 376 U.S. 575, 588 (1964).

> *Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women . . . sometimes display. A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.

*Liteky v. United States*, 510 U.S. 540, 555–56 (1994) (emphasis in original). Insofar as the Confrontation Clause is concerned, "trial judges retain wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. VanArsdall*, 475 U.S. 673, 679 (1986).

## 2. Application

The trial judge in Petitioner's case interjected himself into the proceedings several times. It appears from the written record that he was impatient at times, and one time he admitted that he was frustrated by defense counsel's repetitious and

irrelevant questions.  *See* 7/15/10 Trial Tr., ECF No. 18-4, PageID.617.  But most of his comments, questions, and interruptions apparently were meant to advance the trial, to stop the attorneys from pursuing irrelevant issues, or to clarify the issues. This was acceptable conduct.  *See Powers*, 500 F.3d at 512 (noting that most of the trial court's comments could "be construed as attempts to keep the parties focused on the issues related specifically to the crime charged and to prevent counsel from asking repetitive questions"); *id.* at 513 (stating that, "[a]lthough the court frequently interjected with what the record suggests was an exasperated tone, the nature and scope of the court's comments were quite narrow; the court cautioned the parties to move on from irrelevant areas of inquiry, refused to allow counsel to ask duplicative questions, and sought out stipulations of undisputed facts").

The number of times a trial court interjects itself into the proceedings should be considered.  *Id*. at 513.  At Petitioner's trial, the trial judge directed questions to the following prosecution witnesses:  the victim, Albert Sadler; Sadler's girlfriend, Ewanda George; Sadler's mother, Regina Davey; Sadler's cousin, Maresha Davey; and Investigator James Blanks.

### a.  Albert Sadler

On the first day of trial, the judge asked Sadler:

- whether there were any other persons standing nearby when he was shot and who else was in the immediate area (ECF No. 18-3, PageID.415);

● to demonstrate how close Petitioner got to him or to the van where Sadler was standing when he was shot (*id*. at PageID.421);

● how close Petitioner was to the van and whether Petitioner was standing at the driver's side of the van next to Sadler's girlfriend (*id*. at PageID.424);

● whether he was testifying that Petitioner's comment to Sadler and members of Sadler's group was not in Sadler's statement to the police or whether he was denying that he made the statement to the police (*id*. at PageID.434);

● how many times Sadler had been to the nightclub before the night in question, whether he had previously seen Petitioner there, the number of times he had previously seen Petitioner there, what Petitioner was doing at those times, whether there were other members of Sadler's rap group at the door when Sadler was at the door, and whether members of any other rap groups were at the door when Sadler was there (*id.* at PageID.457-458).

### b.  Ewanda George

On the same day, the trial judge asked Sadler's girlfriend, Ewanda George, whether Sadler and Sadler's friend Darryl Lacy were wearing the same kind of clothing on the night of the crime.  *See id*. at PageID.467.

### c.  Regina Davey

On the second day of trial, the trial judge directed the following questions and remarks to Sadler's mother, Regina Davey:

> THE COURT:  Ms. Davey, you said you were on the curbside or the passenger side of the of the van, right?

> THE WITNESS:  Yes.

35

THE COURT:  Describe that van.  Is it one that has the regular front door that you get in on the passenger seat front and it has the sliding door in the back or just the regular kind of a door?

THE WITNESS:   The sliding door on the side.

THE COURT:   Had the sliding door been pulled open at the time?

THE WITNESS:  Yes.

THE COURT:  So, it was open.  And where were you standing and Mr. Sadler standing in relation to where the sliding door was?

THE WITNESS:  He was standing on the passenger side at the front door, I was standing right there by the side of the sliding door.

THE COURT:  Okay.  And when you say that the Defendant came across the street and he stood near Ms. George and fired the gun, do you remember how it was fired, like, through the window?  Did you see through the window?

THE WITNESS:  It was like that, the gun was tipped like that when he shot it.

THE COURT:  Like moved to the side?

THE WITNESS:  The gun was too (sic) the side.

THE COURT:   Rather than – I don't know what the terms [are], but kind of laid to the side in his hand?

THE WITNESS:  Yeah.

THE COURT:   What I'm asking is did he shoot over the car, through the window?

THE WITNESS:  Through the window.

7/15/10 Trial Tr., ECF No. 18-4, PageID.506-507.

### d.  Maresha Davey and James Blanks

Maresha Davey was Sadler's cousin.  The trial judge interrupted the prosecutor's direct examination of Ms. Davey to tell Ms. Davey to answer the prosecutor's question and not to elaborate on her answers.  *See id.* at PageID.542. Later, during the cross-examination, the trial judge questioned Ms. Davey as follows:

> Ms. Davey, just in terms of when you say, without saying feet, when you think of yourself in the position where the Defendant was when you say he fired the gun and where the van was, and was it, like, as close as the court reporter, a little bit further?  Can you sort of do it that way in terms of a number of feet?  From where you are, you being the Defendant and the gun is fired, what's the closest thing that you can see here that would be about where the van was and Ms. George?

*Id*. at PageID.557.  Ms. Davey then estimated the distance that Petitioner had been from the van where Sadler was shot.  *See id.*

The court asked Investigator James Blanks whether he received a report on fingerprints and whether there was anything with Petitioner's fingerprints on it.  *See id*. at PageID.617-618.  But Blanks answered, "No," and this testimony favored the defense.  Defense counsel, moreover, had already asked Blanks whether he received a report on fingerprints.  *See id*. at PageID.616.

### e.  The Lack of Bias or Reversible Error; Instructions to the Jury Regarding the Trial Court's Remarks

The trial judge's questioning of prosecution witnesses, as described above, was not enough to constitute reversible error.  In *United States v. Smith,* 561 F.2d 8,

13-14 (6th Cir. 1977), for example, the Sixth Circuit Court of Appeals found no abuse of discretion even though the trial court posed more than two-hundred fifty questions to witnesses over the course of a month-long trial involving complex issues and a number of defendants.  And in *United States v. Lewis*, 338 F.2d 137, 140–41 (6th Cir. 1964), the Sixth Circuit concluded that asking more than 1100 questions over a five-day trial was not a desirable judicial practice, but that it did not constitute prejudicial and reversible error.

Furthermore, the trial judge in Petitioner's case did not exhibit bias in his questioning or interruptions.  Nor did he consistently favor the prosecution.  He often ruled in favor of the defense.  *See, e.g.,* 7/15/10 Trial Tr., ECF No. 18-4, PageID.522 (overruling the prosecutor's objection to defense counsel's repetitive question, because defense counsel was trying to clarify the facts); *id.* at PageID.565 (sustaining defense counsel's objection to the prosecutor's leading question and instructing the prosecutor to have the witness clarify a fact); *id*. at PageID.611 (overruling the prosecutor's objection to defense counsel's argumentative question); *id*. at PageID.655-656 (overruling the prosecutor's objections to defense counsel's questioning of a defense witness); *id.* at PageID.664 (overruling the prosecutor's objection to defense counsel's question); *id*. at 668 (telling the prosecutor to sit down after she asked the trial judge to make defense counsel establish that a witness had personal knowledge of the things being asked of him); *id.* at PageID.686 (overruling

the prosecutor's objection to Petitioner's hearsay testimony because the testimony was part of the *res gestae* and offered to show what happened in Petitioner's presence).

Although the trial court did become impatient and critical of defense counsel at times, he expressed similar impatience with the prosecutor. *See id*. at 558 (chiding the prosecutor for asking a question about an issue that the court had clarified moments earlier); *id.* at PageID.605 (telling the prosecutor to get to the point); *id*. at 642 (telling the prosecutor to get to the point and move on, because the questions were insignificant and irrelevant).

Moreover, in his preliminary instructions to the jurors, the trial judge informed the jurors that his evidentiary rulings did not reflect any personal opinion about the facts of the case and that the jurors should not give any weight to his rulings or to the number of rulings on either side. The judge then stated that he might question a witness, but if he did, his questions were not intended to reflect his opinion of the evidence or about the case. He explained that his purpose would be to inquire about matters that he thought the lawyers did not fully explore. *See* 7/14/10 Trial Tr., ECF No. 18-3, PageID.363-364.

Finally, at the close of the case, the trial judge instructed the jurors that his comments and questions were not evidence. *See* 7/16/10 Trial Tr., ECF No. 18-5, PageID.743. The judge also said:

> [W]hen I make a comment or give an instruction, I am not trying to
> influence your vote or express a personal opinion about the case.  If you
> believe that I have an opinion about how you should decide this case,
> you must pay no attention to that opinion.  You are the only judges of
> the facts and you should decide this case from the evidence.

*Id*. at PageID.743-744.

The trial court's intervention in Petitioner's trial was within the range of
acceptable judicial behavior, and it did not violate Petitioner's constitutional rights
to present a defense or to confront the witnesses against him.   Further, any
constitutional error could not have a "substantial and injurious effect or influence"
on the jury's verdict, *Brecht v. Abrahamson,* 507 U.S. 619, 623 (1993), and was
harmless, given the trial court's instructions to the jury regarding his questions and
comments during the trial.   The state courts' rejection of Petitioner's claim,
therefore, was objectively reasonable, and Petitioner is not entitled to relief on the
claim.

### D.  Trial Counsel

Petitioner's fourth claim alleges ineffective assistance of trial counsel.
Petitioner states that his trial attorney failed to: (1) act as an advocate, undeflected
by conflicting considerations; (2) investigate; (3) file pretrial motions to suppress
evidence; (4) present a defense; and (5) object to the trial judge's conduct.  *See* ECF
No. 22, PageID.898.   More specifically, Petitioner alleges that defense counsel
failed to:  call a witness, who would have testified favorably for the defense; view

photographs before stipulating to their admission; file a pretrial motion to suppress evidence based on the lack of probable cause; and object to the oath read to the jury and the trial judge's questioning of witnesses. *See id*. at PageID.898-899. The state successor court cited *Strickland v. Washington*, 466 U.S. 668 (1984), when ruling on Petitioner's claim and concluded that Petitioner was not deprived of effective assistance of trial counsel. *See* ECF No. 27-4, PageID.1149.

### 1. Clearly Established Federal Law

To prevail on his claim about trial counsel, Petitioner must show that his trial "counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. The deficient-performance prong "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. Petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Id*. at 688.

The "prejudice" prong "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. Petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

"The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105 (internal and end citations omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id*.

### 2. Application

#### a. Failure to Defend, Investigate, and Advocate

Petitioner alleges that defense counsel failed to present a defense or act as an advocate, undeflected by conflicting considerations, but Petitioner has not explained what the conflicting considerations were. Further, the record shows that defense counsel was a tireless advocate for Petitioner. He cross-examined all the prosecution witnesses, tried to highlight inconsistencies in their testimony, and implied that the witnesses had coordinated their testimonies by discussing the case with each other. Defense counsel also tried to show that the prosecution's investigation of the case was inadequate.

Petitioner alleges that defense counsel failed to investigate the case, but the record demonstrates that defense counsel was well prepared, and Petitioner has not pointed to any witnesses or evidence that counsel should have investigated and failed to discover. The defense theory was that Petitioner did not possess or fire a gun

42

during the incident in question and that Petitioner did not leave the nightclub during the incident.  To that end, defense counsel put Petitioner and four other witnesses on the witness stand.  Petitioner has not identified any other witnesses that defense counsel could have called or what their testimony would have been.

### b.  Stipulating to Photographs before Viewing Them

Petitioner alleges that defense counsel stipulated to the admission of photographs before viewing the evidence.  The record, however, indicates that defense counsel had an opportunity to view the photographs before they were admitted in evidence and that he had no objection to them.  *See* 7/14/10 Trial Tr., ECF No. 18-3, PageID.383-384.

Petitioner, nevertheless, contends that counsel did not discover until trial that the evidence technician who testified about the photographs (police officer David Andrews) was not the person who took the photographs.  Officer Andrews testified for the first time on cross-examination that he did not take the photographs.  *See id*., PageID.392-393, 396-398.  But this did not affect the fairness of the trial, because Andrews responded to the crime scene, made a sketch of the crime scene, and testified at trial that the photographs accurately represented the crime scene.  *See id*. at PageID.380-384.

Although one of the photographs appeared to show suspected blood in the street, whereas Officer Andrews maintained that he saw blood on the sidewalk, *see*

*id.* at PageID.388-90, defense counsel was able to explore this discrepancy when he cross-examined Andrews.  Andrews then conceded that he could not determine whether a photograph depicted blood in the middle of the street or on the sidewalk across the street from the nightclub.  He also admitted that he had not noticed any blood in the street at the time.  *See id*. at PageID.396-397, 399-400.

In conclusion, defense counsel was able to effectively cross-examine Officer Andrews even though counsel may not have seen the photographs before trial and even though Andrews was not the photographer.  Furthermore, the photographs were not incriminating, because no one disputed that the victim had been shot by the nightclub and had to be taken to the hospital for his injuries.  Petitioner has failed to show that defense counsel's performance was deficient or prejudicial.

### c.  Failure to Object to the Oath and the Trial Court's Questions; Failure to Move to Suppress Evidence

Petitioner contends that defense counsel should have objected to the oath read to the jury and to the trial judge's questioning of witnesses.  But the oath was adequate and not unconstitutional.  Further, Petitioner admits that defense counsel may have been trying to placate the trial judge by not objecting to the judge's interventions and that any objections to the judge's conduct could have antagonized the judge.  *See* ECF No. 22, PageID.899.

Petitioner's allegation that defense counsel should have moved to suppress evidence lacks merit, because there was no basis for filing the motion.  The

eyewitnesses' observations provided probable cause for arresting Petitioner. In addition, Petitioner's custodial statement to Sergeant Jackson appears to have been voluntary and knowing. Before the interrogation, Petitioner was advised of his constitutional rights, and he waived his rights. He subsequently initialed the answers that he made to Sergeant Jackson's questions, and he signed the written statement. *See* 7/15/10 Trial Tr., ECF No. 18-4, PageID.579-586.

Furthermore, there was nothing incriminating to suppress. There was no physical evidence linking Petitioner to the crime, and in his statement to Sergeant Jackson, Petitioner denied having a gun or shooting anyone during the incident in question. Although he admitted to getting into a fight, he claimed that the fight started when six to eight males tried to force their way into the club. He also claimed that two of the men struck him with their fists several times while he was pushing them out the door, and he denied going outside during the incident. *See id*. at PageID.582-585.

Defense counsel's performance was objectively reasonable, and any deficiencies in counsel's performance did not prejudice Petitioner. Accordingly, the state courts' rejection of Petitioner's claim was not contrary to, or an unreasonable objection of, *Strickland*, and Petitioner is not entitled to relief on his claim.

### E.  Appellate Counsel

Petitioner alleges that his appellate attorney was ineffective, because the attorney:  prevented him from raising issues in a *pro se* supplemental brief on direct appeal; failed to raise the issues that Petitioner presented to the successor trial court in his motion for relief from judgment; and failed to request an evidentiary hearing. *See* ECF No. 22, PageID.901-907.   The successor trial court disagreed with Petitioner's assessment of appellate counsel and concluded that appellate counsel did not provide ineffective assistance.  *See* ECF No. 27-4, PageID.1149-1151.

The proper standard for evaluating a claim about appellate counsel is the standard enunciated in *Strickland*.  *Smith v. Robbins*, 528 U.S. 259, 285 (2000).  To prevail on his claim about appellate counsel, Petitioner must demonstrate (1) that his appellate attorney acted unreasonably in failing to discover and raise non-frivolous issues on appeal, and (2) there is a reasonable probability that he would have prevailed on appeal if his attorney had raised the issues.  *Id*. (citing *Strickland,* 466 U.S. at 687-91, 694).

> "[A]n appellate advocate may deliver deficient performance and prejudice a defendant by omitting a 'dead-bang winner,' even though counsel may have presented strong but unsuccessful claims on appeal." *United States v. Cook,* 45 F.3d 388, 395 (10th Cir. 1995) (citing *Page v. United States,* 884 F.2d 300, 302 (7th Cir. 1989)).  A "dead-bang winner" is an issue which was obvious from the trial record, *see e.g., Matire v. Wainwright,* 811 F.2d 1430, 1438 (11th Cir. 1987) (counsel's failure to raise issue which "was obvious on the record, and must have leaped out upon even a casual reading of [the] transcript" was deficient

performance, and one which would have resulted in a reversal on appeal). *Id.*

*Meade v. Lavigne*, 265 F. Supp. 2d 849, 870 (E.D. Mich. 2003) (some punctuation marks modified).

An appellate attorney, however, is not required to raise every non-frivolous claim requested by his or her client if the attorney decides, as a matter of professional judgment, not to raise the claim. *Jones v. Barnes*, 463 U.S. 745, 751 (1983). In fact,

> the process of " 'winnowing out weaker arguments on appeal' " is "the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986) (quoting *Barnes*, 463 U.S. at 751-52, 103 S.Ct. 3308). "Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986).

*Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir. 2002).

The claims that Petitioner alleges his appellate attorney should have raised on appeal, or should have helped Petitioner raise in a *pro se* supplemental brief, are the claims about the oath to the jury, the trial court's questioning of prosecution witnesses, and trial counsel. Those claims are not dead-bang winners or clearly stronger than the claim that appellate counsel raised on direct appeal, because the oath to the jury was adequate to protect Petitioner's rights, the trial court's questioning of prosecution witnesses was acceptable judicial behavior, and trial counsel's performance was neither deficient, nor prejudicial. Therefore, appellate counsel's performance was not deficient, and his alleged failure to help Petitioner

raise the claims did not prejudice Petitioner.  Further, the state courts' rejection of Petitioner's claim was not contrary to, or an unreasonable application of, *Strickland* or *Smith v. Robbins*.  Petitioner has no right to relief on his claim about appellate counsel.

## F.  The Trial Court's Denial of an Evidentiary Hearing

In his sixth and final claim, Petitioner alleges that the trial court erred on post-appellate review when it failed to recognize the need for an evidentiary hearing on Petitioner's claims about trial and appellate counsel.  Petitioner asserts that an evidentiary hearing was necessary for him to establish the two-prong test set forth in *Strickland*.  *See* ECF No. 22, PageID.908-910.

> Petitioner's claim lacks merit, because post-conviction relief is:

> further removed from the criminal trial than is discretionary direct review.  It is not part of the criminal proceeding itself, and it is in fact considered to be civil in nature.  See *Fay v. Noia,* 372 U.S. 391, 423–424, 83 S.Ct. 822, 841, 9 L.Ed.2d 837 (1963).  It is a collateral attack that normally occurs only after the defendant has failed to secure relief through direct review of his conviction.

*Pennsylvania v. Finley*, 481 U.S. 551, 556–57 (1987).  Stated differently, "[s]tate collateral proceedings are not constitutionally required as an adjunct to the state criminal proceedings and serve a different and more limited purpose than either the trial or appeal."  *Murray v. Giarratano*, 492 U.S. 1, 10 (1989).

The Sixth Circuit Court of Appeals, therefore, "has consistently held that errors in post-conviction proceedings are outside the scope of federal habeas corpus

review." *Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007) (citing K*irby v. Dutton*,

794 F.2d 245, 246-47 (6th Cir. 1986), and *Roe v. Baker*, 316 F.3d 557, 571 (6th Cir.

2002)).  The reason that claims challenging state post-conviction proceedings cannot

be brought under 28 U.S.C. § 2254 is that:

> " 'the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and ... the traditional function of the writ is to secure release from illegal custody.' " *Kirby,* 794 F.2d at 246 (quoting *Preiser v. Rodriguez,* 411 U.S. 475, 484, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973)). . . .  A due process claim related to collateral post-conviction proceedings, even if resolved in a petitioner's favor, would not "result [in] ... release or a reduction in ... time to be served or in any other way affect his detention because we would not be reviewing any matter directly pertaining to his detention." *Kirby,* 794 F.2d at 247.

*Id.*  Moreover,

> it would be an unusual intrusion for federal courts to second-guess state procedures for resolving motions once they have been presented.  States are independent sovereigns, and the federal government generally speaking should respect their choices about how to adjudicate disputes.
>
> . . . [Federal courts] must . . . presume that, once a federal claim comes before a state court, the state judge will use a fair procedure to achieve a just resolution of the claim – resolving some motions with neither an evidentiary hearing nor an oral argument, some with an oral argument alone, some with both.

*Good v. Berghuis*, 729 F.3d 636, 639 (6th Cir. 2013).  Accordingly, Petitioner's

challenge to the state court's post-conviction procedures is not cognizable in this

habeas corpus action.

## IV.  Conclusion

Petitioner's claims lack merit, and the state courts' rejection of the claims was neither contrary to, nor an unreasonable application of, Supreme Court precedent. Accordingly, the amended habeas corpus petition is denied.

The Court declines to grant a certificate of appealability because reasonable jurists could not disagree with the Court's resolution of Petitioner's claims, nor conclude that the issues are adequate to deserve encouragement to proceed further. *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  Nevertheless, if Petitioner appeals this decision, he may proceed *in forma pauperis* on appeal because an appeal could be taken in good faith.  28 U.S.C. § 1915(a)(3).

     _s/Arthur J. Tarnow_____
     ARTHUR J. TARNOW
     SENIOR UNITED STATES DISTRICT JUDGE

Dated: November 30, 2020